# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CASE NO. ____

_____

## IN RE: GARY RAY BOWLES,

## PETITIONER.

_____

## APPLICATION FOR LEAVE TO FILE
## SECOND OR SUCCESSIVE HABEAS CORPUS PETITION
## BY A PRISONER IN STATE CUSTODY

## CAPITAL CASE

## EXECUTION SCHEDULED FOR AUGUST 22, 2019 at 6:00 P.M.

Terri Backhus, Fla. Bar No. 946427
    Chief, Capital Habeas Unit
Sean Gunn, Esq.
Kelsey Peregoy, Esq.
Office of the Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301
(850) 942-8818
Terri_Backhus@fd.org

*Counsel for Mr. Bowles*

*IN Re: GARY RAY BOWLES*                                    CASE NO. ____

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 11th Cir. Rule 26.1, Petitioner Gary Ray Bowles lists the following parties that have an interest in the outcome of his appeal:

Backhus, Terri: Counsel for Petitioner

Bowles, Gary Ray: Petitioner

Corrigan, Timothy J.: United States District Court Judge

Gunn, Sean: Counsel for Petitioner

Donahue, Jennifer: Assistant Attorney General

Millsaps, Charmaine: Assistant Attorney General

Moody, Ashley: Florida Attorney General

Peregoy, Kelsey: Counsel for Petitioner

**Corporate Disclosure**: None

Page 1 of 1

**TABLE OF CONTENTS**

TABLE OF CONTENTS..........................................................................................i

PRELIMINARY STATEMENT ......................................................................1

INTRODUCTION ............................................................................................2

PROCEDURAL HISTORY...............................................................................4

ARGUMENT ....................................................................................................8

I.      MR. BOWLES IS INTELLECTUALLY DISABLED.................................8

        A.      The Legal Standard for Intellectual Disability.....................................8

        B.      Mr. Bowles Meets the Criteria for Intellectual Disability ..................11

                i.      Mr. Bowles has Significantly Subaverage Intellectual
                        Functioning ...........................................................................11

                ii.     Mr. Bowles Has Significant Adaptive Deficits ........................19

                iii.    Mr. Bowles's Intellectual Disability Onset Before 18
                        Years of Age ...........................................................................27

        C.      Conclusion............................................................................................28

II.     MR. BOWLES'S *ATKINS* CLAIM MEETS THE STANDARD FOR
        A SUCCESSIVE PETITION UNDER 28 U.S.C. § 2244(b)(2) ..................28

III.    MR. BOWLES IS INNOCENT OF THE DEATH PENALTY....................35

CONCLUSION ................................................................................................38

# PRELIMINARY STATEMENT

On August 15, 2019, Mr. Bowles filed a federal habeas petition in the district court. Mr. Bowles acknowledged that the petition was his second-in-time petition brought under 28 U.S.C. § 2254. However, Mr. Bowles asserted that it was not a "second or successive" petition within the meaning of 28 U.S.C. § 2244(b)(2); and that the district court had the jurisdiction and authority to address the merits of the constitutional claims presented therein. Mr. Bowles also asserted that the text of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and Supreme Court jurisprudence regarding statutory interpretation provided that he should be permitted to proceed via § 2241.

On August 18, 2019, the district court issued an order stating that it was without authority to consider Mr. Bowles's claim without approval from this Court because the petition was second or successive. Doc. 11 at 15. According to the district court, "Petitioner's path is to seek permission from the Eleventh Circuit to file a successive petition." Doc. 11 at 15.

Mr. Bowles is appealing by separate notice the district court's dismissal of his petition. In light of the district court's statement, Mr. Bowles, pursuant to 28 U.S.C. § 2244(b), also respectfully requests that this Court authorize him to file a successive petition under 28 U.S.C. § 2254 in the district court.

1

# INTRODUCTION

Gary Ray Bowles is an intellectually disabled man on Florida's death row. Despite the United States Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), that the execution of intellectually disabled individuals violates the Eighth Amendment, Mr. Bowles was precluded from litigating his claim of intellectual disability until recently.

At the time that *Atkins* was decided, the Supreme Court "left 'to the States the task of developing appropriate ways to enforce the constitutional restriction.'" *Hall v. Florida*, 572 U.S. 701, 719 (2014) (quoting *Atkins*, 536 U.S. at 317)). As such, Florida litigants were constrained by Florida's statutory definition of intellectual disability in pursuing their claims. After *Atkins*, Florida's statutory definition of intellectual disability required an IQ score of "two or more standard deviations from the mean score on a standardized intelligence test," for a litigant to qualify as intellectually disabled. *See, e.g.*, *Cherry v. State*, 959 So. 2d 702, 712 (Fla. 2007) (quoting Fla. Stat. § 921.137(1) (2002)); *see also Zack v. State*, 911 So. 2d 1190, 1201 (Fla. 2005) ("Under Florida law, one of the criteria to determine if a person is [intellectually disabled] is that he or she has an IQ of 70 or below."); *Cherry v. State*, 781 So. 2d 1040, 1041 (Fla. 2000) (accepting testimony that only an IQ of 70 or below qualified to establish intellectual disability). Florida courts applied this statutory definition as a hard IQ score cutoff of 70, failing to account for the Standard

Error of Measurement (SEM) and interpreting IQ scores between 70 and 75 as a "failure to produce such evidence [that] was fatal to the entire claim," *Foster v. State*, 260 So. 3d 174, 178 (Fla. 2018).

In *Hall v. Florida*, the Supreme Court invalidated Florida's IQ-score cutoff because it unacceptably risked execution of individuals within the Eighth Amendment's categorical exemption, given the SEM. *See* 572 U.S. at 724. The Florida Supreme Court subsequently held, in *Walls v. State,* 213 So. 340 (Fla. 2016), that *Hall* was retroactive in Florida. Thus, it was not until *Walls* was decided that Mr. Bowles could seek to enforce his constitutional right not to be executed; Mr. Bowles's qualifying IQ score is a 74.

Although Mr. Bowles litigated his first federal habeas petition post-*Atkins*, he was unable to raise a good faith claim at the time due to Florida's then-existing restrictive definition of intellectual disability. Mr. Bowles therefore did not raise such a claim in his first habeas petition. His claim is now cognizable for the first time in a successive habeas application, as a prisoner may file a successive application when it is based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2254(b)(2)(A).

Mr. Bowles recognizes that this Court's precedent is contrary to his argument. In the case of *In Re: Omar Blanco*, No. 18-13262 at *18 (11th Cir. Aug. 30, 2018)

(unpublished opinion), for instance, this Court found that "Mr. Blanco has failed to make a *prima facie* showing that his claim—whether brought under *Atkins* alone, or under *Atkins* and *Hall* together—satisfies the requirements of § 2244(b)(2)(A)." And in *In re Henry*, 757 F.3d 1151, 1153 (11th Cir. 2014), this Court held that the exception in § 2244(b)(2)(A) did not apply to claims of intellectual disability based on *Hall* because the Supreme Court had not made *Hall* retroactive. *See also In re Hill*, 777 F.3d 1214 (11th Cir. 2015).

Mr. Bowles respectfully requests that this Court revisit the issue and thereafter authorize him to file a second successive petition in the district court. As will be discussed herein, the Fifth Circuit Court of Appeals recently permitted the authorization of a successive intellectual disability claim under the theory that an *Atkins* claim was unavailable where the claim would have failed under state law at the time of the initial habeas petition. *In re Johnson*, No. 19-20552, 2019 WL 3814384 (5th Cir. Aug. 14, 2019).

## PROCEDURAL HISTORY

In 1996, Mr. Bowles pleaded guilty to first-degree murder in the circuit court of the Fourth Judicial Circuit. Subsequent to a penalty phase, the jury recommended death by a vote of 10 to 2, and the trial court followed the jury's recommendation. *See Bowles v. State*, 716 So. 2d 769, 770 (Fla. 1998). On appeal, the Florida Supreme Court found that Mr. Bowles's death sentence was unreliable because the trial court

erred in allowing the State to introduce prejudicial evidence, and thus vacated Mr. Bowles's death sentence and remanded for a new sentencing proceeding. *Id.* at 773.

A new penalty phase was held in May 1999, after which the jury unanimously recommended a death sentence, and the trial court again followed the jury's recommendation. *See Bowles v. State*, 804 So. 2d 1173, 1175 (Fla. 2001). On direct appeal, the Florida Supreme Court affirmed, *id.* at 1184, and the United States Supreme Court denied certiorari on June 17, 2002. *Bowles v. Florida*, 536 U.S. 930 (2002).

On December 9, 2002, Mr. Bowles filed an initial motion for postconviction relief in the state circuit court. An evidentiary hearing was held, and on August 12, 2005, the trial court denied relief. On February 14, 2008, the Florida Supreme Court affirmed. *Bowles v. State*, 979 So. 2d 182, 193 (Fla. 2008).

On August 8, 2008, Mr. Bowles filed a petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254 in the Middle District of Florida. *Bowles v. Sec'y, Fla. Dep't of Corrs.*, No. 3:08-cv-791-HLA, ECF No. 1 (M.D. Fla. Aug. 8, 2008). Mr. Bowles's petition was denied on December 23, 2009. *Id.* (ECF No. 18). This Court affirmed. *Bowles v. Sec'y for Dep't of Corrs.*, 608 F.3d 1313, 1317 (11th Cir. 2010), *cert. denied*, 562 U.S. 1068 (2010).

Mr. Bowles proceeded to file several successive motions for state postconviction relief, the latest of which was filed on October 19, 2017. In that

motion, Mr. Bowles argued that he is intellectually disabled and that his execution would therefore violate the Eighth Amendment in light of *Atkins*, *Hall*, and *Moore v. Texas*, 137 S. Ct. 1039 (2017). *See* Record on Appeal, *State v. Bowles*, No. 19-1184 (Fla. 2019) (hereinafter PCR-ID) at 1-13.

On March 12, 2019, while the motion was pending, Mr. Bowles's state postconviction counsel, Francis Jerome ("Jerry") Shea, unexpectedly moved to withdraw from the case. PCR-ID at 62. On March 25, 2019, the state court granted Mr. Shea's motion and appointed a lawyer from the Office of the Capital Collateral Regional Counsel—North (CCRC-N) as Mr. Bowles's new state-appointed counsel. PCR-ID at 108-09. On March 26, 2019, CCRC-N attorney Karin Moore entered an appearance in the case. PCR-ID at 110. On April 11, 2019, Ms. Moore filed a motion for additional time to either reply to the State's recently filed answer memorandum or to amend the postconviction motion that had been filed by Mr. Shea. *See* PCR-ID at 131-35.

On April 15, 2019, the circuit court granted Ms. Moore an additional 90 days to either file a reply to the State's answer or move to amend Mr. Bowles's intellectual disability claim, should she determine that an amendment was necessary. PCR-ID at 136. Under the state court's order, Ms. Moore's reply or motion to amend was due July 14, 2019. But on June 11, 2019—less than 80 days after Ms. Moore first entered an appearance in the case, and more than a month before the state court's deadline

for her to review the case and decide whether to file a reply or motion to amend—the Governor signed Mr. Bowles's death warrant, scheduling the execution for August 22, 2019. The Florida Supreme Court thereafter ordered Mr. Bowles's intellectual disability proceedings expedited, and required the circuit court to decide Mr. Bowles's intellectual disability claim *in total* by July 17, 2019. Death Warrant Scheduling Order, *Bowles v. State*, Nos. SC89-261, SC96-732 (Fla. June 12, 2019).

On July 11, 2019, the circuit court summarily denied Mr. Bowles's claim as time-barred as a result of the Florida Supreme Court's rulings in *Rodriguez v. State*, 250 So. 3d 616 (Fla. 2016), *Blanco v. State*, 249 So. 3d 536 (Fla. 2018), and *Harvey v. State*, 260 So. 3d 906 (Fla. 2018). *See* PCR-ID at 1344-53. In those rulings, the Florida Supreme Court held that individuals who did not previously raise an intellectual disability claim pursuant to Fla. R. Crim. P. 3.203 (2004) were time-barred from doing so, regardless of the United States Supreme Court's ruling in *Hall*, which was held retroactively applicable to Florida litigants by the Florida Supreme Court in *Walls v. State*, 213 So. 3d 340 (Fla. 2016).

On August 14, 2019, the Florida Supreme Court affirmed the circuit court's order, agreeing that Mr. Bowles's intellectual disability claim was untimely in accordance with the aforementioned decisions. *Bowles v. State*, No. SC19-1184 (Fla. August 13, 2019).

On August 15, 2019, Mr. Bowles filed a federal habeas petition in the district court. On August 18, 2019, the district court issued an Order finding that Mr. Bowles's petition was second or successive, and that it therefore lacked the jurisdiction to hear it without prior authorization from this Court. Doc. 11 at 1-2. The district court advised Mr. Bowles to seek the necessary authorization from this Court. *See id.* at 15.

## ARGUMENT

### I. MR. BOWLES IS INTELLECTUALLY DISABLED

#### A. The Legal Standard for Intellectual Disability

In 2002, the United States Supreme Court first held that execution of the intellectually disabled violates the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins*, the Court explained:

> Those [intellectually disabled] persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against [intellectually disabled] defendants.

536 U.S. at 306-07.

*Atkins* further explained that while intellectually disabled persons frequently know the difference between right and wrong and are competent to stand trial, "by definition they have diminished capacities to understand and process information, to

communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reaction of others." *Id.* at 318. Because of their diminished capacity and culpability, the Court concluded that neither of the two rationales supporting capital punishment—retribution and deterrence—properly applies to intellectually disabled individuals. *Id.* at 319-20.

The Supreme Court also discussed how the reduced capacity of intellectually disabled individuals provides a second justification for categorically exempting them from the death penalty:

> The risk "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), is enhanced, not only by the possibility of false confessions, [ ] but also by the lesser ability of [intellectually disabled] defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. [Intellectually disabled] defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted lack of remorse for their crimes.

*Id.* at 320-21 (footnote omitted).

Put simply, "[n]o legitimate penological purpose is served by executing a person with intellectual disability. To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being." *Hall v. Florida*, 572 U.S. 701, 708 (2014).

*Atkins* referred to the prevailing clinical definitions as helpful in the task of determining whether an individual should be exempted from the death penalty. 536 U.S. at 308 n.3, 317. The Supreme Court cited the definition for intellectual disability established by the American Association on Mental Retardation, which has since been renamed the American Association on Intellectual and Developmental Disabilities ("AAIDD"). The Supreme Court also cited the definition contained in the American Psychiatric Association's ("APA") Diagnostic and Statistical Manual of Mental Disorders – 4th Edition – Text Revision ("DSM-IV-TR"), which was the most significant diagnostic guide for mental health practitioners in the United States at the time of the Supreme Court's opinion. The DSM-IV-TR has since been replaced by the Diagnostic and Statistical Manual of Mental Disorders – 5th Edition ("DSM-5").

Although *Atkins* left to each State the task of formulating the definition of intellectual disability, states do not have "unfettered discretion to define the full scope of the constitutional protection." *Hall*, 572 U.S. at 719; *Moore v. Texas*, 137 S. Ct. 1039, 1052-53 (2017) (same). "The medical community's current standards supply one constraint on states' leeway in this area. Reflecting improved understanding over time . . . current manuals offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians.'"

*Moore*, 137 S. Ct. at 1053 (quoting DSM-5 at 7). Accordingly, *Atkins* and its progeny do not "license disregard of current medical standards." *Id.* at 1049.

Pursuant to the definitions set forth by the APA and the AAIDD and endorsed by the Supreme Court in *Atkins*, *Hall* and *Moore*, there are three prongs to a finding of intellectual disability: (1) deficits in intellectual functioning/subaverage intellectual functioning, (2) deficits in adaptive functioning, and (3) onset before age 18. *See* DSM-5 at 33; *Intellectual Disability: Definition, Classification, and Systems of Supports – 11ᵗʰ Edition*, American Association on Intellectual and Developmental Disabilities (2010) ("AAIDD-2010") at 5; *Atkins*, 536 U.S. at 307 n.3 (enumerating the criteria for a diagnosis of intellectual disability as set forth by the AAIDD and the APA).

### B. Mr. Bowles Meets the Criteria for Intellectual Disability

#### i. Mr. Bowles Has Significantly Subaverage Intellectual Functioning

##### a. Clinical Considerations in the Interpretation of IQ Scores

A determination of whether intellectual disability exists requires significantly subaverage intelligence *approximately* two standard deviations below the mean, and this prong of the diagnosis is typically met through the use of standardized intelligence instruments (IQ tests). *See, e.g.*, User's Guide to AAIDD-11, p. 23. The medical community recognizes, however, that while this can be demonstrated

through the use of such IQ tests, the determination of whether this prong is met does not include a "cutoff score." *Id*. As the User's Guide to AAIDD-11 notes: "A fixed point cutoff for [intellectual disability] is not psychometrically justifiable." *Id*. "The diagnosis of [intellectual disability] is intended to reflect a clinical judgment rather than an actuarial determination." *Id*.

While the AAIDD and DSM acknowledge that IQ testing is a significant consideration in whether the deficits in intellectual functioning prong exists, such testing must be considered in conjunction with factors that have been observed to affect the interpretation of IQ scores. IQ test scores, for example, must be considered in conjunction with the standard error of measurement (SEM). The DSM-5 instructs:

> Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally + 5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65-75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

DSM-5, p. 37. The AAIDD-11 also instructs that a SEM of up to five points be taken into consideration in the interpretation of IQ scores. AAIDD-11, p. 36; *see also Mental Retardation: Definition, classification, and systems of support* (10th ed. 2002), AAMR (AAIDD-10), p. 58-59 ("[T]he SEM is considered in determining the existence of significant subaverage intellectual functioning . . . In effect, this expands the operational definition of mental retardation to 75, and that score of 75 may still contain measurement error.").

The Supreme Court has recognized the importance of considering the SEM present in testing instruments, consistent with this guidance from the medical community. *See Hall*, 572 U.S. at 713 ("The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score."). Thus, the Supreme Court has held that an IQ score of 75 is "squarely in the range of potential intellectual disability." *Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015).

Additionally, it has been widely observed that professional authority provides for the correction of IQ scores for norm obsolescence (the observation that IQ scores of the population increases over time), which is also known as the Flynn Effect. *See, e.g.,* James W. Ellis, Carolina Everington & Anna M. Delpha, *Evaluating Intellectual Disability: Clinical Assessments in* Atkins *Cases*, 46 HOFSTRA L. REV. 1305, 1363-66 (2018) (discussing the Norm Obsolescence ("Flynn") Effect); DSM-5, p. 37 (discussing the Flynn Effect); AAIDD-11, p. 37 (same).

For example, the AAIDD-11 advises: "As discussed in the *User's Guide* (Shalock et al., 2007) that accompanies the 10th editions of this *Manual*, best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score." AAIDD-11 at 37. Thus, "[b]oth the [AAIDD-11] and this User's Guide recommend that in cases in which a test with aging norms is used

as part of a diagnosis of ID, a corrected Full Scale IQ upward of 3 points per decade for age of the norms is warranted." User's Guide to AAIDD-11, p. 23.

In considering whether Mr. Bowles meets the first prong of intellectual disability—significantly subaverage intellectual functioning—his IQ test scores must be considered in conjunction with the factors the medical community uses in their interpretation of the same, including the SEM and the Flynn Effect.

### b. Mr. Bowles's IQ and Neuropsychological Testing

Relevant to the determination of his intellectual functioning, Mr. Bowles has had two full-scale IQ tests, and has been further evaluated by two neuropsychologists, in 2003 and 2018 (Dr. Harry Krop and Dr. Barry Crown, respectively). This testing supports that Mr. Bowles has significantly subaverage intellectual functioning, and evidences that Mr. Bowles meets the criteria for the first prong of intellectual disability.

The first relevant full-scale IQ test was given to Mr. Bowles in 1995. Prior to his penalty phase proceeding in 1996, Mr. Bowles was evaluated by psychologist Dr. Elizabeth McMahon. She was the confidential defense expert in Mr. Bowles's case, and Mr. Bowles's trial attorney, Bill White, asked her to evaluate Mr. Bowles only for competence, insanity, and mitigation purposes. *See, e.g.*, Record on Appeal, *Bowles v. State*, 979 So. 2d 182 (Fla. 2008) (hereinafter, "PCR-[Volume Number]"), PCR-II at 196. Dr. McMahon did not write a report. *See, e.g.*, PCR-II at 251 (Dr.

Krop noting that Dr. McMahon did not write a report). As part of her general evaluation, Dr. McMahon administered to Mr. Bowles the Wechsler Adult Intelligence Scale, Revised (WAIS-R), in 1995. PCR-II at 199. Mr. Bowles received a full-scale IQ score of 80 on this test. PCR-II at 239 (Dr. Krop's testimony about Dr. McMahon's testing).

The second IQ test that Mr. Bowles was administered was the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), which was given to him in 2017 by psychologist Dr. Jethro Toomer. *See* App. at 1-6. Mr. Bowles received an IQ score of 74 on the WAIS-IV. App. at 3.

As both of the recent evaluators of Mr. Bowles, psychologist Dr. Toomer and psychiatrist Dr. Julie Kessel, agree, Mr. Bowles meets the prong of significantly subaverage intellectual functioning, which is supported by his IQ testing. The WAIS-IV score of 74 that Mr. Bowles received in 2017, considered within the accepted SEM of ± 5 points, gives Mr. Bowles a potential IQ of as low as 69, which is below two standard deviations from the mean. This is sufficient to establish this prong of a diagnosis of intellectual disability. *See, e.g.*, *Brumfield*, 135 S. Ct. at 2271 (noting that an IQ score of 75 was "entirely consistent with intellectual disability.").

The only other valid full-scale IQ test that Mr. Bowles was given, the WAIS-R in 1995, returned a score of 80, which was not previously corrected for norm obsolescence. When that correction is made, Mr. Bowles's 1995 WAIS-R testing

results in a score between 75-76, which when the SEM is taken into account, puts this IQ score as low as approximately 70. As Dr. Toomer observed: "The WAIS-R was normed in 1981, and it is my understanding that this test was given by Dr. McMahon in 1995 to Mr. Bowles. Adjusted for the Flynn effect, this WAIS-R score yields an IQ score of 75-76, which is not inconsistent with the current WAIS-IV results." App. at 3. Dr. Kessel likewise notes: "I agree with Dr. Toomer that, at the time of the [trial] proceedings, the Flynn Effect had not been applied to this score, and that, when this recognized and accepted psychometric principle is applied, the reported score overestimates Mr. Bowles's intellectual functioning. Further, I find that this test score by Dr. McMahon does not rule out intellectual disability." App. at 24.

It is also worth noting that Mr. Bowles's IQ score on the WAIS-IV is likely the most accurate gauge of his actual intellectual functioning, because "the WAIS-IV, which was not available to Dr. McMahon, is a more modern, updated, and psychometrically accurate instrument." App. at 3. Dr. Kessel agreed, noting: "The WAIS-R is less psychometrically accurate than the WAIS-IV in this situation and overestimates IQ in non-appropriately normed populations." App. at 24. Even Dr. McMahon herself agreed with the opinions of Dr. Toomer and Dr. Kessel about the WAIS-IV, as she recently observed:

> For the purpose of my general psychological evaluation in the 1990s, I administered the [WAIS-R] to Mr. Bowles. At the time, the WAIS-R

was an adequate instrument. The [WAIS-IV] did not exist then. I agree that now the WAIS-IV is the most current, standardized, full-scale intelligence assessment instrument available and is a better measure of a person's intellectual functioning than the WAIS-R.

App. at 58.

Neuropsychological testing conducted by Dr. Barry Crown in 2018 is also consistent with significantly subaverage intellectual functioning. *See* App. at 7-8. Dr. Crown noted that Mr. Bowles performed in one test in the 14th percentile for his age group, and that on the Reitan-Indiana Aphasia Screening Test, "Mr. Bowles mistakenly converted a simple subtraction problem into a division problem. Additionally, when instructed to place his left hand on his right ear, Mr. Bowles places his left hand on his left ear, which is indicative of cerebral disturbance." App. at 27. On the Shipley Abstractions, Mr. Bowles received an "abstraction age of 11 years, 0 months," and scored in the 12th and 6th percentiles for his age group on other testing. App. at 8. Dr. Crown concluded: "As a result of my testing, interview with Mr. Bowles, and review of the records, I conclude that Mr. Bowles suffers from brain damage, particularly in the tertiary area of the frontal lobe of the brain." *Id*. Dr. Crown noted, "Mr. Bowles's brain damage supports the finding that he is an intellectually disabled person[.]" *Id*.

Dr. Crown's neuropsychological findings are supported by Dr. Harry Krop, who evaluated Mr. Bowles in state postconviction in 2003. In his 2018 review of materials developed in the course of Mr. Bowles's intellectual disability

investigation, Dr. Krop found: "Based on materials I have reviewed, it is likely that Mr. Bowles is an intellectually disabled person. These materials are consistent with my prior opinion that Mr. Bowles has neuropsychological and cognitive impairments, which have pervaded Mr. Bowles's life." App. at 13.

### c. Other Evidence of Impaired Intellectual Functioning

IQ testing, and other formal psychological testing, is the most persuasive evidence of intellectual functioning. However, evidence showing impaired intellectual functioning is nothing new; Mr. Bowles's intellectual limitations have been observed by past evaluators as well as lay witnesses. For example, lay witnesses that have observed Mr. Bowles over the course of his life have described him consistently as "slow" (App. at 38 (Glen Price), 43 (Julian Owens), 55 (Tina Bozied)), and noted that he could not understand directions or how to do simple tasks (App. at 56 (Tina Bozied), 33-34 (Elain Shagena), 38-39 (Glen Price), 30 (Chester Hodges), 26 (Bill Fields)).

Additionally, Dr. McMahon observed from her 1995 evaluation of Mr. Bowles that he had a number of intellectual limitations. Specifically, Dr. McMahon noted that her testing revealed that Mr. Bowles "doesn't learn by his own mistakes," PCR-II at 203, and that Mr. Bowles was "probably not working with what we would say is an intact brain," PCR-II at 207.

Thus, multiple pieces of evidence, including IQ and neuropsychological testing, as well as the statements of lay witnesses and past evaluators, show that Mr. Bowles has significantly subaverage intellectual functioning, satisfying the first prong of an intellectual disability diagnosis.

### ii. Mr. Bowles Has Significant Adaptive Deficits

Adaptive deficits "refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM-5, p. 37; *see also* AAIDD-11, p. 43 ("Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.").

The adaptive deficits prong of an intellectual disability diagnosis "is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." DSM-5, p. 38; *see also* AAIDD-11, p. 43 (noting the same). Importantly, this prong of intellectual disability is met by clinical judgment of deficits, and is not negated by strengths. *See, e.g.*, User's Guide to AAIDD-11, p. 26 (noting that it is an incorrect stereotype that "[p]ersons with [intellectual disability] are characterized only by limitations and do not have strengths that occur concomitantly with the limitations").

Although Mr. Bowles need only exhibit deficits in one adaptive deficits domain, he has evidence of deficits in all three of these domains.

### a. Mr. Bowles Has Deficits in Conceptual Skills

The conceptual domain includes skills such as "language; reading and writing; and money, time, and number concepts." AAIDD-11, p. 44. For individuals with mild intellectual disability, "abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills (i.e., reading, money management), are impaired." DSM-5, p. 34.

Mr. Bowles has significant adaptive deficits in skills within the conceptual domain. Notably, he struggled in school, particularly after primary school. This was significant to Dr. Kessel, who wrote:

> Gary appears to have performed adequately in primary school until the fourth grade, when his grades and behavior began to decline. There is a reference to him having been transferred to a special education program for challenged learners. This suggests that Gary had difficulty with the transition from concrete to more abstract and conceptual thinking. In middle school, he received Cs and Ds. Gary's school performance continued to decline throughout his adolescence. By the sixth grade, he was receiving primarily failing grades, receiving six F grades and a C grade, and an incomplete grade in English. Despite these grades, records note that he was advanced into seventh grade, where he received Fs, Cs, and a D. In the eighth grade, Gary dropped out of school, failing completely his first semester and having no recorded grades in the second semester.

App. at 17-18.

Mr. Bowles also has significant deficits in his executive functioning and short-term memory, which have been observed by both mental health professionals and lay witnesses. For example, Dr. Toomer administered the Scales of Independent Behavior-Revised (SIB-R) for Mr. Bowles with two third-party reporters, Julian Owens and Ken White. *See* App. at 10. On this standardized assessment tool, which is designed to measure adaptive deficits, Dr. Toomer found that Mr. Bowles had deficits in a number of areas relevant to the conceptual domain, including deficits in language comprehension and expression and understanding of money and value. *Id*.

Further, neuropsychologist Dr. Barry Crown found that Mr. Bowles had brain damage. App. at 18. Mr. Bowles's brain damage indicates that he specifically struggles with deficits in the conceptual domain. *Id*. Dr. Crown found:

> Mr. Bowles's brain damage would have had a profound effect on his ability to control his impulses, exercise reasoning and judgment, and ability to understand the consequences of his actions, both in the present and in the future. He would have been impaired in all of these areas on a daily basis, but these impairments would be even more pronounced under stress . . . Given [Mr. Bowles's] underlying impairments, the existence of conceptual deficits is manifest.

*Id*. That Dr. Crown found that Mr. Bowles would have trouble, based on his brain damage, with impulsivity and understanding consequences is supported by the experiences of lay witnesses with Mr. Bowles. *See* App. at 38-39 (Glen Price: "[Gary] wasn't a bad kid, he just didn't think about things like that and couldn't understand the consequences of what he was doing."); 30 (Chester Hodges: "Gary

was very impulsive, and did not think about the consequences of his actions. I don't know if he understood the consequences of his actions. He seemed to have no concept that his actions could affect others negatively . . . if he wanted something, he just took it, like a toddler. He did not have self-control.").

In addition to being impulsive, Mr. Bowles also struggled with planning for the future. App. at 53 (Roger Connell: "[Gary] was impulsive, and never seemed to think about his future . . . He only thought of what his next immediate need was."); 56 (Tina Bozied: "Gary wasn't able to plan in advance. If he didn't have it when he needed it he would have just gone without.").

Additionally, many others have observed deficits in Mr. Bowles's short-term memory. Julian Owens recalled from time he spent with Mr. Bowles in his young adulthood:

> Gary was extremely forgetful. I especially remember that Gary would always lose his money, or leave it laying around. We worked in labor pools, which meant that we worked hard – outside, doing manual labor in the hot sun – and we were paid in cash at the end of a long, exhausting day. Then whatever we were paid would be all we had until we could get another job assignment, but Gary just didn't seem to understand that. He would leave his money wherever – at the job site, at a bar, or in a hotel. It was always so shocking to me that he would do that, because we worked so hard for so little. How could you lose all you had, after a day like that? Half the time that Gary would lose his money he wouldn't even realize it. Someone else in the group of people that we'd be with would figure out that Gary didn't have his money, and we would all be the ones trying to retrace Gary's steps and figure out where he left his money. This was very common with Gary.

App. at 43-44.

### b. Mr. Bowles Has Deficits in Social Skills

The social domain includes skills such as "interpersonal skills, social responsibility, self-esteem, gullibility, naiveté (i.e. wariness), follows rules/obeys laws, avoids being victimized, and social problem solving." AAIDD-11, p. 44. Adults with mild intellectual disability are "immature in social interactions," and may have "difficultly in accurately perceiving peers' social cues." DSM-5, p. 34. Such individuals may also have "difficulties regulating emotion and behavior in age-appropriate fashion" and have "limited understanding of risk in social situations," which means they are "at risk of being manipulated by others (gullibility)." *Id*.

Mr. Bowles has significant deficits in skills in the social domain. Dr. Toomer, in his assessment of Mr. Bowles's deficits using the SIB-R, found that Mr. Bowles had deficits in social interaction. *See* App. at 10-11. Furthermore, Mr. Bowles spent much of his youth being victimized, including being the victim of sexual abuse. *See* App. at 17. Moreover, Mr. Bowles is consistently described by those who have known him from his childhood and through his adulthood as "gullible," "naïve," and frequently getting "taken advantage of." App. at 38 (Glen Price); 46 (Julian Owens); 55 (Tina Bozied); 48-49 (Ken White). Additionally, many individuals described social situations in which Mr. Bowles floundered without help. For example, Julian Owens noted:

> Gary wasn't good at reading social situations, though. I remember that when we would be out, girls would flirt with Gary or hit on him, but he didn't seem to realize it. Gary was a good-looking guy, but had limited understanding of these kinds of social situations with women. It happened so frequently that we would all tease him about it.

App. at 46. Other individuals describe Mr. Bowles as "immature," and having childlike interests. App. at 32 (Diana Quinn); 45-46 (Julian Owens). Tina Bozied, who knew Mr. Bowles when they were both teenagers, described:

> When I spoke to him, sometimes he would be blank, like he didn't understand what I was saying. When we would get into arguments, I would have to explain to him multiple times why I was upset, and even then it seemed like he didn't get it.

App. at 55.

### c. Mr. Bowles Has Deficits in Practical Skills

The practical domain includes skills such as "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." AAIDD-11, p. 44. Adults with mild intellectual disabilities "may function age-appropriately in personal care," but "need some support with complex daily living tasks in comparison to peers." DSM-5, p. 34. These adults typically need help with "grocery shopping, transportation, home and child-care organization, nutritious food preparation, and banking and money management." *Id*. Additionally, these "[i]ndividuals generally need support to make health care decisions and legal decisions, and to learn to perform a skilled vocation competently." *Id*.

24

Mr. Bowles has deficits in his practical skills. Dr. Toomer, in his assessment of Mr. Bowles's deficits using the SIB-R, found that Mr. Bowles had deficits in personal living skills, community living skills, personal self-care, time and punctuality, and work skills. *See* App. at 10-11.

Through his late adolescence and adulthood, Mr. Bowles struggled with travel and public transportation. Julian Owens noted of Mr. Bowles in his adulthood:

> [Gary] had trouble using the public bus in Jacksonville Beach. Back then, the bus system was much simpler than it is now, there was basically two places the buses went, either to the beach or into town. I saw Gary get on the wrong bus several times, going in the completely wrong direction. This always surprised me – how can you get it wrong when it was only going two basic places? – but that was just Gary. Sometimes I would take the bus with Gary to help him out, and if no one were around to help Gary, he would just walk rather than use the bus. I doubt very seriously he could have used the bus system without someone helping him.

App. at 45. Likewise, Tina Bozied recalled:

> Gary and I walked most places, but when we weren't walking, I noticed Gary struggled with other kinds of transportation. He could not use a public bus system without help. On one occasion, my parents bought Gary and me airplane tickets so we could fly back from Florida to where they lived in Michigan. If I had not been there to make sure we got our tickets, were checked in, and made it to the right location to board our flight, Gary would never have made it. I believe he would have missed his flight, or tried to get on the wrong place. The whole process was out of Gary's abilities, and it was obvious it overwhelmed him.

App. at 56.

Other individuals also noted that Mr. Bowles lacked basic skills to care for himself, well into his adulthood. He struggled especially with using money, from

25

paying for items with cash and counting appropriate change, to being able to save money, or pay for larger items like hotel rooms, rent, or other bills. *See* App. at 44-45 (Julian Owens); 55-56 (Tina Bozied). Mr. Bowles frequently used others as a "crutch," App. at 53 (Roger Connell), because he could not otherwise provide for himself. He relied on other people to let him live with them, which they allowed for free, and to care for him. *See* App. at 47 (Ken White); 55 (Tina Bozied); 53 (Roger Connell); 44-45 (Julian Owen). Additionally, while Mr. Bowles was for the most part not formally employed during his adult life, he required assistance in finding employment, *see* App. at 47 (Ken White), and was not successful at the jobs that he did have. For example, one of his former employers, Elain Shagena, remembered:

> [Gary] did not do any tasks that required any level of sophistication or complexity, even if it was a slightly complex task. . . . We tried to train Gary to use [a four-step] machine, but he could never learn it, and Gary was never able to work the machine properly. He could not understand the process or follow the four basic steps. He seemed to try very hard, but he continually made mistakes. Gary also came so close to cutting himself with the razor knife involved in operating the machine a few times. I was worried about Gary's safety. He never managed to successfully use the machine, even with help and under a great deal of supervision. I had to move him off of the machine as a result of his mistakes and the risk of him injuring himself.

App. at 33. Because of his inability to provide for himself, Gary turned to prostitution and temporary living situations with others. As Dr. Kessel summarized:

> In total, Gary's adulthood, outside of the incarceration setting, was largely transient and dysfunctional. Gary lacked the ability to function as an adult, provide for himself, problem-solve, and understand the world around him. It is unsurprising in this context and with his history

of sexual abuse, that Gary turned to prostitution for survival and depended heavily on older men to care for him. He has little ability to use money, to use public transportation, or to provide his own basic needs. The pattern of his adulthood reflects the same theme of deficiencies that were present in his adolescence and childhood.

App. at 21.

Mr. Bowles has displayed significant practical domain deficits as a result of his intellectual limitations, which have pervaded his entire life, and thus, on that basis alone and in combination with his deficits in the other domains described above, he meets the second prong for a diagnosis of intellectual disability.

### iii. Mr. Bowles's Intellectual Disability Onset Before 18 Years of Age

The third prong of an intellectual disability diagnosis requires the "[o]nset of intellectual and adaptive deficits during the developmental period," DSM-5, p. 33, which is generally referred to as prior to the age of 18 years old, *see* AAIDD-11, p. 5. *See also Foster*, 260 So. 3d at 178. This prong refers only to "recognition that intellectual and adaptive deficits are present during childhood or adolescence," and can be met by "history or current presentation." DSM-5, p. 38. Mr. Bowles need not prove the exact origin of his disability, be it in utero, due to progressive damage such as malnutrition, or due to acquired disease or injury (such as traumatic brain injury) to meet this prong of the diagnosis. *See* AAIDD-11, p. 27 (noting that "disability does not necessarily have to have been formally identified").

27

Mr. Bowles's intellectual and adaptive deficits existed before he was 18 years old. Several individuals note deficits for Mr. Bowles who knew him in his early childhood, *see* App. at 38-39 (Glen Price); 25-26 (Bill Fields); 29-30 (Chester Hodges), and who knew him in his teenaged-years and young adulthood, *id.* at 55-56 (Tina Bozied); 47-49 (Ken White). Moreover, Mr. Bowles struggled in school, achieved failing grades once academic requirements "beg[an] to move from concrete concepts . . . . to more abstract concepts." *See* App. at 4 (Report of Dr. Toomer). And Dr. Crown noted that his brain damage was consistent from a source in his childhood, possibly his juvenile use of inhalants (such as paint, glue, or gasoline), or potentially even earlier, such as a perinatal origin. App. at 8. Drs. Kessel, Toomer, and Krop likewise found that evidence existed of his poor intellectual functioning in his childhood. *See* App. at 17-18; 23; 23; 4-6.

### C. Conclusion

Mr. Bowles is an intellectually disabled person. He suffers from significant deficits in intellectual and adaptive functioning, which have been present since early in the developmental period. Because Mr. Bowles is mentally disabled, he "should be categorically excluded from execution." *Atkins*, 536 U.S. at 318.

## II. MR. BOWLES'S *ATKINS* CLAIM MEETS THE STANDARD FOR A SUCCESSIVE PETITION UNDER 28 U.S.C. § 2244(b)(1)

To receive authorization to proceed under 28 U.S.C. 2244(b)(2)(A), Mr. Bowles must make a prima facie showing that his *Atkins* claim "relies on a new rule

of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." This Court has held that an *Atkins* claim meets this requirement. *See In re Holladay*, 331 F.3d 1169, 1173 (11th Cir. 2003). The question here, then, is whether Mr. Bowles's *Atkins* claim was previously unavailable.

Because the Supreme Court announced its decision in *Atkins* before Mr. Bowles's initial § 2254 petition, the question of "unavailability" centers around the feasibility of raising such a claim. *See In re Cathey*, 857 F.3d 221, 229 (5th Cir. 2017). The Fifth Circuit's recent treatment of successive intellectual disability claims—which looks to the viability of an *Atkins* claim at the time the initial § 2254 petition was filed—is particularly instructive on this point. This is especially true because the Fifth Circuit presides over cases originating from Texas. Like Florida, Texas's definition of intellectual disability was recently invalidated as unconstitutional by the Supreme Court because of Texas's dependence on factors not endorsed by the medical community in diagnosing intellectual disability and the Supreme Court's concern that this created too grave a risk that those with intellectual disabilities may be executed. *See Moore v. Texas*, 137 S. Ct. 1039 (2017); *see also Hall v. Florida*, 572 U.S. 701 (2014) (finding Florida's strict 70-IQ cutoff unconstitutional and outside the teachings of the medical community). As a result, the Fifth Circuit has similarly had to deal with successive claims by prisoners who

did not previously qualify for intellectual disability under the unconstitutional structure, but who can now show they are in fact intellectually disabled.

Moreover, it is important to note that the Fifth Circuit's approach for addressing these claims stemmed from its adoption of this Court's feasibility standard. This Court first addressed feasibility in determining the effect of the Supreme Court announcing a new rule after a habeas petition has been filed but before the district court has ruled. *See In re Everett*, 797 F.3d 1282, 1288 (11th Cir. 2015). This Court held that, in that circumstance, "the applicant must demonstrate that it was not feasible to amend his or her pending petition to include the new claim." *Id.* The Fifth Circuit then relied on this Court's standard in adopting its own similar test for feasibility. *See In re Wood*, 648 F. App'x 388, 391 (5th Cir. 2016) ("We agree with the Eleventh Circuit and adopt the feasibility standard."). In *Wood*, the Fifth Circuit explained that "the Eleventh Circuit has created a standard that takes into account the particular circumstances of the previous habeas proceeding." *Id.*

This "feasibility standard" inspired by this Circuit's jurisprudence later became critical to the Fifth Circuit's treatment of successive intellectual disability claims. While *Wood* "essentially adopted a rebuttable presumption that a new rule of constitutional law was previously available if published by the time a district court ruled on a petitioner's initial habeas petition," *see Cathey*, 857 F.3d at 229 (5th Cir. 2017), the Fifth Circuit acknowledged "a gray area of previous unavailability despite

technical availability," *see id.* at 230. This "gray area" is what the Fifth Circuit has now used to determine whether to grant authorization to file a successive *Atkins* claim. *See id.* at 230.

First, in *In re Cathey*, the petitioner had a 77 IQ score at the time he filed his initial petition. *Id.* at 230. This petition post-dated *Atkins*, and his score of 77 fell "outside the range that was then understood to satisfy the subaverage intellectual functioning prong of an *Atkins* claim." *Id.* Indeed, under Texas law at the time, the state required a score of 70 or lower, and the Fifth Circuit "observed this baseline score . . . when analyzing *Atkins* claims by Texas petitioners." *Id.* Additionally, Texas had announced the *Briseno* factors, a list of factors to be considered in assessing intellectual disability, two months before Mr. Cathey filed his initial federal petition. *Id.* Thus, any *Atkins* claim by Mr. Cathey at that point in time in Texas's state or federal courts would have been meritless.

Following Mr. Cathey's federal litigation, newly discovered evidence showed that Mr. Cathey actually scored "below 73" on an IQ test conducted after his incarceration. *Id.* at 232. By the time these records were disclosed, the courts recognized a 5-point margin of error, which encompassed Mr. Cathey's score "below 73" and that the Flynn effect likely reduced both of these scores even more. *Id.* at 232-33. Based on this new information regarding Mr. Cathey's IQ, the Fifth Circuit found that *Atkins*'s holding was beyond Mr. Cathey's reach before, but he

could now establish a prima facie case of intellectual disability. *Id.* at 233. Importantly for the purposes of determining whether to authorize Mr. Cathey's successor, the Fifth Circuit found that the *Atkins* claim was previously unavailable because, without this new information, it had no merit. As *Cathey* explained, "a claim must have some possibility of merit to be considered available." *Id.* at 232.

The Fifth Circuit used this same approach more recently in *In re Johnson*, No. 19-20552, 2019 WL 3814384 (5th Cir. Aug. 14, 2019). *Atkins* was decided before Mr. Johnson went through federal review the first time. *Id.* at *5. The Fifth Circuit described this as a "meaningful hurdle" for Mr. Johnson to "demonstrate why [it] should consider that case to be retroactive as to him." *Id.* Like Mr. Cathey, however, Mr. Johnson's IQ score over 70 made an *Atkins* claim futile during his initial federal habeas litigation. *Id.* at *4. Since Mr. Johnson's initial habeas petition, there had been "recent changes to the medical standards for determining intellectual disability." *Id.* Namely, the publication of the DSM-5 included "significant changes in the diagnosis of intellectual disability, which changed the focus from specific IQ scores to clinical judgment." *Id.* In contrast, "[t]he previous diagnostic manual, in effect when Johnson filed his initial federal habeas petition, did not classify Johnson as intellectually disabled because of his IQ." *Id.* Accordingly, the Fifth Circuit granted Mr. Johnson authorization to file a successive petition. *Id.* at 9. The Fifth Circuit found that this situation paralleled that in *Cathey* because "both Cathey and

now Johnson were presented . . . with reasons that an *Atkins* claim is possibly meritorious when it had not previously been." *Id.* at *6. It further found it "correct to equate legal availability with changes in the standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*." *Id.* at *6.

It is also notable that, while the DSM-5 opening the door to Mr. Johnson's intellectual disability claim had been published on May 18, 2013, Mr. Johnson did not assert an intellectual disability claim until 2019. Yet, the Fifth Circuit suggested that the ineffectiveness of Mr. Johnson's conflicted counsel may provide cause to equitably toll the delay in raising his claim. *Id.* The Fifth Circuit found that the district court was best positioned to make this determination. *Id.*

Here, an *Atkins* claim was no more viable for Mr. Bowles in the State of Florida than it was for Mr. Cathey and Mr. Johnson in Texas. In Florida, prisoners with IQ scores between 70 and 75, including Mr. Bowles, could not bring a meritorious *Atkins* claim before the Supreme Court decided *Hall*, 572 U.S. at 701. And, as in *Johnson*, the diagnostic manual in effect at the time of Mr. Bowles's initial § 2254 petition was the DSM-IV-TR, which indicated that a cutoff at 70 was appropriate and emphasized the importance of the IQ score in diagnosing intellectual disability. *See* DSM-IV-TR at 41.  Unlike *Johnson*, however, the publication of the DSM-5 and its diminution of the IQ score did not open the door for Mr. Bowles to present an *Atkins* claim at that time either, as Florida's statute did not reflect this

change in diagnostic standards. It was not until *Hall* that Florida was forced to adapt to current medical standards, including acknowledgment of the SEM for those like Mr. Bowles whose scores fell between 70 and 75. This change in diagnostic standards, when made retroactive to Mr. Bowles through the Florida Supreme Court in *Walls v. State*, 213 So. 3d 340 (Fla. 2016), is what deemed Mr. Bowles's IQ score qualifying, thus making an intellectual disability claim viable for the first time.

Accordingly, this Court should follow the Fifth Circuit's guidance in *Cathey* and *Johnson* and find that Mr. Bowles's *Atkins* claim was not available until *Hall* changed Florida's diagnostic standards and was thereafter made retroactive in *Walls*. In following this approach, this Court would be doing no more than following the same rationale behind the feasibility standard that the Fifth Circuit has previously lauded for "tak[ing] into account the particular circumstances of the previous habeas proceeding." *See Wood*, 648 F. App'x at 391. When taking those circumstances into account here, this Court should find that an *Atkins* claim was not truly available to Mr. Bowles until *Hall* and *Walls* were decided, which was years after Mr. Bowles's initial habeas petition. Thus, Mr. Bowles can make a prima facie showing that his successive petition should be authorized under 2244(b)(2)(A).

Mr. Bowles recognizes this Court rejected similar arguments in *In re Blanco*, No. 18-13262-P (11th Cir. Aug. 30, 2018). Mr. Bowles respectfully requests this Court reconsider in light of the trend of cases out of the Supreme Court and other

federal courts promoting the increased protection of persons with intellectual disability from the death penalty. The Supreme Court has continued to enforce constitutional parameters where it has found state procedures lacking. *See, e.g.*, *Moore v. Texas*, 139 S. Ct. 666 (2019) (finding the Texas Court of Criminal Appeals erred when, following the Supreme Court finding Texas's *Briseno* factors unconstitutional, the Texas court continued to apply similarly unconstitutional factors to find Mr. Moore was not intellectually disabled); *Johnson*, 2019 WL 3814384, at *9 (the Fifth Circuit continued to follow the feasibility standard first applied to *Atkins* claims in *Cathey* and authorized a successive petition based on a newly-raised *Atkins* claim); *Webster v. Lockett*, No. 2:12-cv-86-WTL-MJD, 2019 WL 2514833, at *11) (finding the petitioner intellectually disabled after the Seventh Circuit had allowed him to proceed under 28 U.S.C. § 2241 when the Fifth Circuit declined to authorize his successive petition).

## III. MR. BOWLES IS INNOCENT OF THE DEATH PENALTY

As a person with intellectual disability who is categorically exempt from the death penalty pursuant to the Eighth Amendment, *Atkins*, 536 U.S. at 318, Mr. Bowles is actually innocent of the death penalty. As such, he should be permitted to proceed in federal court with a habeas claim even if it would otherwise be barred by AEDPA's statute of limitations. *See Schlup v. Delo*, 513 U.S. 298 (1995); *Sawyer v. Whitley*, 505 U.S. 333 (1992). This Court has itself recognized this principle. *See*

*Magwood v. Warden, Alabama Dep't of Corr.*, 664 F.3d 1340, 1346 (11th Cir. 2011) ("The actual innocence requirement focuses on those elements that render a defendant eligible for the death penalty.").

Other circuits have found that innocence of the death penalty applies in the context of intellectual disability claims. *See, e.g.*, *Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014) (holding that intellectual disabled petitioners may bring claims of actual innocence of the death penalty notwithstanding a failure to follow state procedural rules); *Prieto v. Zook*, 791 F.3d 465, 469 (4th Cir. 2015) (allowing petitioners to overcome procedural default upon showing that, "if instructed properly under *Hall* and *Atkins*, 'no reasonable juror' could have found him eligible for the death penalty under Virginia law"). The district courts have followed suit. *See, e.g.*, *Sasser v. Norris*, 553 F.3d 1121, 1126 n.4 (8th Cir. 2009) ("A petitioner is 'actually innocent' of the death penalty where he is ineligible for the death penalty."), *abrogated on other grounds by Wood v. Milyard*, 566 U.S. 463 (2012); *Moran v. McDaniel*, 80 F.3d 1261, 1272 (9th Cir. 1996); *Black v. Workman*, 682 F.3d 880, 915 (10th Cir. 2012) ("This [actual-innocence] exception applies to those who are actually innocent of the crime of conviction and those 'actually innocent' of the death penalty (that is, not eligible for the death penalty under applicable law).").

Mr. Bowles recognizes this Court's precedent that an application to file a successive habeas petition under § 2244(b)(2)(B) may not be based on a sentencing claim. *See e.g.*, *In re Hill*, 777 F.3d 1214, 1225 (11th Cir. 2015) ("Indeed, Hill's attempt to raise such a claim is foreclosed both by the law-of-the-case doctrine and the prior-panel-precedent rule, as we held in *In re Hill* that 'federal law does not authorize the filing of a successive application under § 2244(b)(2) based on a sentencing claim even in death cases.'").

Mr. Bowles respectfully requests this this Court reconsider its prior precedent. In *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013), the Supreme Court held that a claim of actual innocence empowers a federal court to adjudicate a habeas petition filed outside the § 2241(d)(1) statute of limitations. In so doing, the Court explained that a claim of actual innocence is not a basis for "equitable tolling" of the statute of limitations, but rather is an "equitable exception" to statutory limitations periods that requires no showing of exceptional circumstances of diligence. *Id.* at 391-92.

Further, in *McQuiggin*, the Supreme Court explained that "[w]e have applied the miscarriage of justice exception to overcome various procedural defaults," including *inter alia*, "successive petitions asserting previously rejected claims" and "abusive petitions asserting in a second petition claims that could have been raised

37

in a first petition." 569 U.S. at 392-93 (citations omitted). This language provides direct support for the proposition that the miscarriage of justice exception should be available to petitioners to excuse any potential procedural bar, including a petitioner such as Mr. Bowles invoking actual innocence of the death penalty to proceed under § 2241(b)(2).

## CONCLUSION

This Court should authorize Mr. Bowles's *Atkins* claim to proceed in the district court.

Respectfully submitted,

/s/ Terri L. Backhus
Terri L. Backhus
Sean Gunn
Kelsey Peregoy
Capital Habeas Unit
Federal Public Defender
Northern District of Florida
227 N. Bronough St., Ste. 4200
Tallahassee, FL 32301-1300
(850) 942-8818
terri_backhus@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, a copy of the foregoing has been furnished via ECF to Assistant Attorney General Charmaine Millsaps at charmaine.millsaps@myfloridalegal.com and capapp@myfloridalegal.com; and

Assistant Attorney General Jennifer A. Donahue at jennifer.donahue@myfloridalegal.com; and via electronic mail to the Florida Supreme Court at warrant@flcourts.org.

/s/ Terri L. Backhus
Terri L. Backhus
